IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KAREN MARTIN | CASE NO. 1:04 CV 206 |
| Plaintiff | |
| -vs- | MEMORANDUM OF OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| GENERAL ELECTRIC COMPANY | |
| Defendant | |

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Plaintiff Karen Martin has filed this lawsuit against her current employer General Electric Company ("GE"), raising claims of sex discrimination (count one), race discrimination (count two), and retaliation (count three). (Docket #38). On 2 February 2005, defendant GE filed a motion for summary judgment arguing that it was entitled to judgment as a matter of law on each of Ms. Martin's claims. (Docket #43). In her response, Ms. Martin expressly abandoned her race discrimination claim but argued that genuine issues of material fact remain with respect to her sex discrimination and retaliation claims.[1] (Docket #44). GE followed with a reply. (Docket #45)

For the reasons set forth below, defendant GE's motion for summary judgment will be granted.

---

[1] Specifically, Ms. Martin "concedes that the discovery process has produced neither direct nor circumstantial evidence of discrimination against her based upon race." (Docket #44, at 3). Accordingly, GE is entitled to summary judgment on her race discrimination claim.

## I. BACKGROUND

To properly analyze Ms. Martin's claims of sex discrimination and retaliation by GE, the Court begins by examining her employment history with GE, staffing changes which occurred in the Grit Blast area, and Ms. Martin's unsuccessful application for a group leader position in 2003.

### A.     Karen Martin's Employment History and Classification

Plaintiff Karen Martin has been employed by GE since 1979. (Martin Dep. at 11). She was hired as a machine operator in the Halogen Department of its Euclid Lamp Plant ("Euclid Plant"), a position classified as R-11. (Martin Aff. at ¶ 2). In 1997, Ms. Martin became a Coating and Finishing Mechanic ("Coating Mechanic"), a position classified at that time as R-22, at the Euclid Plant. (Martin Dep. at 26 and 28; Martin Aff. at ¶ 5). As a Coating Mechanic, Ms. Martin was responsible for operating both the Grit Blast and the Aluminizer. (Wilson Aff. at ¶¶ 2-3). In this capacity, Ms. Martin worked second shift. (Martin Dep. at 101). Michael Wilson, Group Leader of the Components Department at the Euclid Plant, was responsible for, among other things, overseeing Ms. Martin's work. (Wilson Aff. at ¶1).

In 1999, GE modified the Coating Mechanic position, limiting its duties to Grit Blast operation and reclassifying it as an R-21 position. (Wilson Aff. at ¶ 3; Wilson Dep. at 26). In addition, GE altered the Aluminizer operation schedule so that it was run on first shift only and operated by R-11 employees. (Wilson Aff. at ¶ 3). Despite these changes to Ms. Martin's responsibilities and the formal classification of her position, GE "grandfathered" Ms. Martin in as an R-22 and kept her at that pay rate. (Martin Dep. at 101; Martin Aff. at ¶

2

5). Ms. Martin continues to be employed as an R-22 Coating Mechanic on the second shift and is the only employee to hold an R-22 classification.[2] (Martin Dep. at 28, 79 and 101).

**B.     GE's Staffing of its Grit Blast Operation**

Neither party has effectively developed the record regarding the staffing of GE's Grit Blast operation. However, cobbling together the parties' various assertions, this Court is able to develop some time line regarding changes in staffing.

When Ms. Martin began working as a Coating Mechanic in the Grit Blast area, the Grit Blast machine operated during the second shift only. (Wilson Aff. at ¶ 2). At some point in time after Ms. Martin began working as a Coating Mechanic and before January 2001, GE began a first shift Grit Blast operation. (Martin Aff. at ¶ 7). In January 2001, GE eliminated the first shift in the Grit Blast area such that Ms. Martin was the only Grit Blast mechanic working any shift in the Grit Blast Area. (Martin Aff. at ¶ 7). At some point in 2001, GE rotated two R-21 mechanics from the Flare Room, Isaac Flowers and Jim Horner, to work in the Grit Blast area during the first shift. (Wilson Aff. at ¶ 4; Gleixner Dep. at 18; Flowers Dep. at 13).[3] At some point in 2001, Horner was laid off and Flowers resumed working full-time in the Flare Room. (Flowers Dep. at 21; Martin Dep. at 64). GE then rehired Harold Canterbury, who had been laid off from the Bulb Blowing department, and trained him as both a grit blast mechanic and as a backup flare room mechanic.

---

[2] GE eliminated the R-22 classification and established two classifications, R-21 and R-23, for mechanics. (Martin Dep. at 79).

[3] Although it is not precisely clear when Flowers and Horner worked in the Grit Blast area, it appears that Mr. Flowers worked there at least from 11 May 2001 to 18 June 2001. (Flowers Dep. at 25)

(Canterbury Dep. at 21, Ex. 11; Wilson Aff. at ¶ 5). As of September 2001, Mr. Canterbury worked full-time in the Grit Blast position. (Wilson Aff. at ¶ 5; Martin Aff. at ¶ 9). Both sides agree that, at some point in time, GE again eliminated first shift Grit Blast production and removed Mr. Canterbury from that position, though there is no evidence in the record regarding when exactly this occurred. (Docket #44, at 7; Docket #43, at 7).

On 22 October 2002, Ms. Martin filed a charge of race and sex discrimination with the EEOC asserting that GE had denied her overtime by permitting men to work in her area and had denied her training as well. (Docket #43, Addendum 9).

**C.  Ms. Martin's Application for a Group Leader Position**

On 10 September 2003, GE posted a job notice for a group leader position in the Halogen 9007 department. (Rachmat Dep., Unmarked Ex.). The 9007 department is devoted to a particular type of automotive lamp manufacturing and, according to GE, is the most automated line at the Euclid Plant. (Wacenske Aff. at ¶ 2). The job posting described the general duties of the position and indicated that it was a first shift position which would be paid at the R-25 level. The job posting did not specify any minimal qualifications. Ms. Martin submitted her application for this group leader position on the day it was posted. (Martin Dep. at 140; Martin Aff. at¶ 17).

As Manager of Shop Operations at the Euclid Plant, Ms. Wacenske was responsible for filing this position. (Wacenske Aff. at ¶ 1). Although the only applicants that Ms. Wacenske or Adam Yeloushan, Human Resources Manager at the Euclid Plant, considered minimally qualified for this position "were those with prior 9007 experience," they acquiesced to union demands that all employees, regardless of their prior experience,

4

be interviewed. (Wacenske Aff. at ¶ 3; Yeloushan Aff. at ¶¶ 2-3). In evaluating the applicants, Ms. Wacenske developed a matrix which assigned point values to each applicant based on his or her prior 9007 experience, seniority, supervisory experience, auditing experience, and the interview. (Wacenske Aff. at ¶ 4). She ultimately awarded the position to Tom Mazza, who she deemed to be the most qualified candidate because he had supervisory and auditing experience, because he had three years of experience as a mechanic in the 9007 department, and because he once held a "quality" position. (Wacenske Aff. at ¶¶ 5 and 7). Although plaintiff had more seniority than Mr. Mazza, Ms. Wacenske did not consider her to be minimally qualified because she lacked prior 9007 experience. (Wacenske Aff. at ¶ 7).[4] Like Ms. Martin, Gene Bennett, a male employee with more seniority than Mr. Mazza, did not receive the group leader position because he lacked 9007 experience. (Wacenske Aff. at ¶ 7).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is intended as a mechanism for isolating and disposing of "factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

---

[4] According to Ms. Wacenske, Mr. Mazza scored 24 points on her hiring matrix while Ms. Martin received only 10 points. (Wacenske Aff. at 6).

5

However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. It is not enough for the nonmoving party to point to any alleged factual dispute between the parties. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) To survive summary judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might affect the outcome of the suit under the governing substantive law. Anderson, 477 U.S. at 248. If the non-moving party bears the burden of proof at trial and fails to present "a jury question as to each element of its case," the motion for summary judgment must be granted. Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996) (citing Celotex, 477 U.S. at 322-23). In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587.

### III. LAW & ANALYSIS

In her two remaining claims, Ms. Martin asserts that GE discriminated against her by denying her training and overtime which her male counterparts received and that GE retaliated against her for filing an EEOC charge by denying her advancement to the 9007

6

Group Leader position.  GE contends that it is entitled to judgement as a matter of law on each of her claims.

**A.      Sex Discrimination (Count One)**

In her sex discrimination claim, Ms. Martin alleges that she was subjected to disparate treatment when she was denied training and overtime which was afforded to similarly situated male employees.  This Court begins with a discussion of the pertinent legal standard and then turns to an analysis of the viability of her claim.

1.      Elements of a Sex Discrimination Claim

A plaintiff may establish discrimination "either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination."  Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir.1997).[5]  Of these two mutually exclusive paths of proof, Ms. Martin has only introduced what she purports to be circumstantial evidence of discrimination.  Accordingly, this Court treats this as a circumstantial evidence case and applies the well-known McDonnell Douglas/Burdine burden shifting analysis.

Where there is no direct evidence of discriminatory animus, courts utilize a three-stage analysis in employment discrimination cases.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248,

---

[5] Ms. Martin's amended complaint refers only to state law as the basis for her discrimination claim.  However, because Ohio courts have determined that federal case law interpreting Title VII is generally applicable to cases involving alleged violations of Section 4112, this Court will, as did the parties, assess Ms. Martin's claim by relying on federal case law.  Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 66 Ohio St. 2d 192, 196 (1981); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).

7

252-53 (1981).  The plaintiff carries the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To make a prima facie case of sex discrimination based on disparate treatment, a plaintiff must show that she: (1) was a member of a protected class; (2) was subjected to adverse employment action; (3) was qualified; and (4) was treated differently from similarly situated male employees. Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538-39 (6th Cir. 2002); Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002).  The plaintiff's burden of establishing a prima facie case is "not onerous" and is a "burden easily met." Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 1999); Burdine, 450 U.S. at 254; Singfield v. Akron Metropolitan Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004).  Once the plaintiff establishes a prima facie case by a preponderance of the evidence, an inference of discrimination arises.  Warfield v. Lebanon Correctional Inst., 181 F.3d 723, 728-29 (6th Cir. 1999). Although GE does not dispute that Ms. Martin, as a women, is a member of a protected class or that Ms. Martin was qualified for her position as a Coating Mechanic, it contests her ability to satisfy the second and fourth elements of her *prima facie* case.

If Ms. Martin establishes her *prima facie* case, the burden then shifts to the defendant to rebut the presumption by offering a legitimate, nondiscriminatory reason for her treatment.  McDonnell Douglas Corp., 411 U.S. at 802.  The defendant need not persuade the court that it was "actually motivated by the proffered reasons" but the "explanation provided must be legally sufficient to justify a judgment for the defendant." Burdine, 450 U.S. at 254-55.  To meet its burden, the defendant must clearly articulate, through the introduction of admissible evidence, the nondiscriminatory reasons for its

8

employment decision. Id.

The plaintiff must then respond by demonstrating, by a preponderance of the evidence, that the defendant's proffered reason for the treatment is a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-4.  Plaintiff can show that the defendant's decision was pretextual by presenting sufficient evidence that the proffered reasons: (1) had no basis in fact, (2) did not actually motivate the decision, or (3) were insufficient to warrant the challenged conduct.  Singfield, 389 F.3d at 564; Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994). If the plaintiff has made her prima facie case and presented sufficient evidence for a reasonable jury to reject the defendant's asserted justification for its actions, then the case should be submitted to the factfinder "to determine whether intentional discrimination has occurred." Manzer, 29 F.3d at 1083; Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).  Due to the "elusive factual question" related to an employer's true motivation for employment decisions, courts should exercise caution in granting summary judgment once the plaintiff has established her *prima facie* case.  Singfield, 389 F.3d at 564.

    2.    Overtime Claim

With respect to overtime, Ms. Martin alleges that she was denied overtime opportunities which were afforded to male employees.  Specifically, she argues that Mike Wilson, her group leader, repeatedly took overtime hours that were "intended" for her. (Docket #44, at 5).  She also contends that GE, in creating a first shift in Grit Blast in January 2001, decreased her overtime opportunities while allowing three other male employees – Flowers, Horner, and Canterbury – "to work their regular shift plus overtime in

9

Ms. Martin's Grit Blast department." (Docket #44, at 13).

    *a.*    *General Considerations*

Before discussing Ms. Martin's specific contentions, a few general points require emphasis. Despite vigorous arguments about her loss of overtime due to disparate treatment, Ms. Martin does not point to any evidence in the record which specifies how many hours of overtime she received during the relevant time periods. Moreover, although Ms. Martin frequently refers to Grit Blast as her area or department with proprietary undertones and suggests some entitlement to overtime in that area, Ms. Martin has not identified any evidence to support a right, contractual or otherwise, to overtime.

In her opposition brief, Ms. Martin relies heavily on the affidavits of two co-workers, Linda Whiteside and Synthia Davis. Both affidavits contain several general conclusory statements, such as there was no increase in Grit Blast production in January 2001 (Whiteside Aff. at ¶ 4; Davis Aff. at ¶ 3) and Ms. Martin "is a more productive employee in grit blast than any of the male employees placed there by GE" (Whiteside Aff. at ¶ 10; Davis Aff. at ¶ 8), which are based on speculation and possibly hearsay rather than personal knowledge. Ms. Whiteside testified in her deposition that she never worked with Ms. Martin in her area and did not know whether overtime she had previously received had been assigned to Mr. Canterbury, Mr. Flowers, or Mr. Horner. (Whiteside Dep. at 19). Similarly, there is no evidence that Ms. Davis ever worked with Ms. Martin in the Grit Blast area.

    *b.*    *Mike Wilson*

Ms. Martin claims that Mike Wilson, her Group Leader, took her overtime after she

10

returned from a medical leave in September 2000. (Docket #44, at 5; Martin Aff. at ¶ 6). However, because Ms. Martin has provided no information about her overtime hours before and after her medical leave in 2000, no information about overtime hours worked by Mike Wilson in the Grit Blast area, and no information about overtime hours available in the Grit Blast area during this time period, there are no facts in evidence which support her claim.[6] Moreover, as noted by GE, Mr. Wilson, as Ms. Martin's group leader with a different classification and responsibilities, was not similarly situated to Ms. Martin.[7] Accordingly, with respect to Mike Wilson, Ms. Martin has not established a *prima facie* case of disparate treatment regarding overtime.

        c. *Flowers, Horner, and Canterbury*

The crux of Ms. Martin's overtime argument regarding other GE employees is that she lost overtime with the addition of another Grit Blast shift and that three male employees – Flowers, Horner, and Canterbury – were treated more favorably because they received more overtime than she did when they worked in Grit Blast. Because Ms. Martin has no entitlement to a particular amount of overtime, it is not enough for her to simply argue, as she does at times, that she lost overtime as a result of GE's staffing decisions. Although a decrease in Ms. Martin's overtime may serve as evidence of an adverse employment action, it does not, by itself, demonstrate that her male co-workers were treated more

---

[6] Although Michael Orloski stated in his deposition that Ms. Martin complained that Mike Davis was taking her overtime, he provided no testimony on how, if at all, her overtime hours were affected by Mike Davis. (Orloski Dep. at 19).

[7] Even if Mr. Wilson was taking overtime which Ms. Martin previously received, the evidence in the record suggests that he was doing the very same thing to a male employee, Isaac Flowers, who worked as a mechanic operating the Grit Blast machine for a period of time in 2001. (Flowers Dep. at 25).

11

favorably. Accordingly, to meet the fourth element of her *prima facie* case, she must provide evidence that her male co-workers received more overtime while working in Grit Blast than she did. This she has failed to do.

Ms. Martin's central contention that the male mechanics – Flowers, Horner, and Canterbury – were able to work their regular shift "plus overtime in Ms. Martin's Grit Blast department," is not supported by evidence in the record.[8] (Docket #44, at 6). Mr. Flowers specifically testified that he never received any overtime while he worked in Grit Blast. (Flowers Dep. at 25). With respect to Mr. Horner, the record is completely silent on the amount of overtime he received, if any, when he worked in Grit Blast.[9] Accordingly, the record is devoid of evidence to suggest that Flowers or Horner were treated more favorably during their respective stints in Grit Blast.

In an attempt to demonstrate that Mr. Canterbury was treated more favorably, Ms. Martin offers Canterbury's deposition testimony that received 235 hours of overtime in

---

[8] Ms. Martin frequently makes sweeping statements regarding the impact of Flowers, Hornes, and eventually Canterbury working in the Grit Blast area, which are not substantiated by the record. For instance, as discussed above, she contends that her available overtime decreased after these individuals began working in the Grit Blast area, but provides no specific evidence of that fact – no paystubs, no timecharts, no testimony on the amount of her overtime, etc. Although it may be logical to conclude that Ms. Martin's overtime decreased after these other employees began working in Grit Blast during first shift, such a conclusion would be speculative given that GE, according to Ms. Martin, had a first shift doing Grit Blast as recent as January 2001 and given that an increase in demand could offset the labor increase. Pointing to Exhibit A of the Whiteside Affidavit, Ms. Martin also asserts GE "subsequently confirmed that the company did not need more than one mechanic in the Grit Blast area at the time Harold Canterbury was moved to Grit Blast. . ." (Docket #44, at 7). No such exhibit was attached to the Whiteside Affidavit.

[9] With respect to Mr. Canterbury, her statement is likewise off the mark as his "regular shift," beginning in September 2001, was as a first shift mechanic in the Grit Blast area.

2002.[10] (Canterbury Dep. at 57). The sheer number of Mr. Canterbury's overtime hours, does not constitute evidence of more favorable treatment. Absent any evidence regarding Ms. Martin's overtime, a factfinder could not conclude that Mr. Canterbury was treated more favorably. If Ms. Martin could demonstrate that Mr. Canterbury was similarly situated and treated more favorably, this Court would then have to grapple with GE's non-discriminatory justification and consider whether it was pretextual. This Court does not reach those issues because of Ms. Martin's failure to establish a *prima facie* case.[11]

  c.  *Summary Regarding Overtime*

With respect to her assertion that she was denied overtime because of her sex, Ms. Martin has offered nothing more than bare allegations and has not satisfied her *prima facie* case. Ms. Martin has not presented the Court with any information upon which a rational factfinder could conclude that similarly situated male employees were treated more favorably than her in terms of overtime. Although it is possible that Ms. Martin's overtime decreased after GE added another Grit Blast shift, such a decrease does not suggest unlawful discrimination absent evidence that her comparable male employees

---

[10] Pointing to page 126 of the Rachmat deposition, Ms. Martin alleges that Canterbury was permitted to work a full eight hour Grit Blast shift and then proceed to other departments for overtime work. (Docket #44, at 6). However, plaintiff's citation does not reveal any testimony by Rachmat in support of such a proposition. Similarly, Ms. Martin cites to page 62 of the Canterbury deposition in asserting that Mr. Canterbury was paid at the "higher" R-22 rate, (Docket #44, at 7); however, the deposition transcript itself lends no support to that allegation.

[11] Although it does not bear directly on her overtime opportunities, Ms. Martin contends that Mr. Canterbury's operation of the Grit Blast machine during first shift cost her a day of work. In July 2002, when Mr. Canterbury had worked first shift, there were not enough lamps to grit blast during second shift and so Ms. Martin was told not to come in. (Rachmat Dep. at 100; Martin Dep. at 66). Apparently, the union filed a grievance on Ms. Martin's behalf (Martin Dep. at 70). To resolve the grievance and make up for her lost time, GE offered Ms. Martin "ten (10) hours at time and one-half;" however, Ms. Martin declined its offer. (Martin Dep. at 131, Ex. J).

were treated more favorably.

  3.  <u>Training Claim</u>

  Ms. Martin contends that male employees within her work group were offered training that she was denied. (Docket #44, at 4).[12] As an initial matter, this Court notes that Ms. Martin cannot prove this claim by simply establishing that she was denied training opportunities,[13] regardless of whether or not those opportunities were promised to her.[14] Rather, she must demonstrate that the denial of training meant that she was treated less favorably than similarly situated male employees who received the opportunities she was denied. With that understanding in mind, the essential flaw of Ms. Martin's argument – her failure to identify any similarly situated male employees who were treated more favorably with respect to training – is revealed.

  In several places throughout her brief, Ms. Martin asserts that she was denied training opportunities afforded her male counterparts. (Docket #44, at 4, 7, and 11-13).

---

[12] Besides grit blast, Ms. Martin was trained in aluminizing and as a backup in base fill. (Wilson Dep. at 50; Martin Dep. at 92). Although Ms. Martin claims that she did not initially receive sufficient training on the aluminizer, she received additional training in 2002 after she filed a grievance. (Martin Dep. at 124; Wilson Aff. at ¶7).

[13] Ms. Martin asserts that she was denied training in several areas, such as the Flare Room, the bulb line, on the Jones machine, and on tri-lite packing. (Martin Dep. at 58, 61, and 92).

[14] Ms. Martin vehemently argues that she "had been promised" certain training by GE and that certain training opportunities were guaranteed by her job. (Docket #44, at 7-8). Ms. Martin contends that this guarantee of training opportunities is set forth in the definition of her job duties and states that this definition was attached to Addendum 1. (Docket #44, at 7-8). This Court referred to Addendum 1, but did not find the promised job description. Although Ms. Martin's affidavit states that "in October, 2002 management agreed to provide me with the guaranteed training opportunities," (Martin Aff. at ¶ 13), she never says what those promised training opportunities included. In any case, whether or not Ms. Martin was promised certain training, in and of itself, is irrelevant to her sex discrimination claim. The relevant inquiry is whether she was denied training opportunities afforded similarly situated male employees, whether or not those opportunities were "guaranteed."

14

However, she never identifies who these male counterparts are and what training opportunities they received which she did not.  The evidence of differential treatment in the record on which she relies is equally vague, consisting primarily of identical assertions in the Whiteside and Davis affidavits that "Karen Martin was denied training opportunities in other areas . . . but male employees were not." (Whiteside Aff. at ¶ 11; Davis Aff. at 9). Assuming, without deciding that such testimony would be admissible at trial,[15] it still fails to raise a genuine issue of disputed fact about differential treatment as there is no reference to the identities of the male employees who were purportedly similarly situated and received more favorable treatment and no indication of specific training which was denied Ms. Martin but afforded to male employees.  Although Ms. Martin's vague and unsubstantiated assertions may be appropriate to state a claim in a complaint, they are insufficient to satisfy her burden on summary judgment.

**B.  Retaliation (Count Three)**

Ms. Martin claims that GE retaliated against her because she filed an EEOC charge on 22 October 2002, by denying her advancement to the 9007 Group Leader position on 13 September 2003.[16]

To make out a prima facie case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that:  (1) she engaged in a protected activity; (2) the

---

[15] GE objects to Ms. Davis and Ms. Whiteside's testimony due to a lack of personal knowledge.

[16] In her amended complaint, Ms. Martin alleges that GE also retaliated against her "by reducing her previous wage level."  (Docket #38, at ¶ 21).  As she has not pursued this argument in her opposition brief, this Court does not further consider it.

15

exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000); EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir.1997). If Ms. Martin establishes her *prima facie* case, then, as with her sex discrimination claim, this Court considers GE's proffered legitimate, non-retaliatory explanation and Ms. Martin's contention that the GE's explanation is actually a pretext for retaliation. Singfield, 389 F.3d at 564.

The first three elements of Ms. Martin's *prima facie* case are not seriously contested by GE and are easily satisfied. Ms. Martin's filing of an EEOC charge of discrimination on 22 October 2002 constitutes a protected activity, and it is undisputed that GE knew of the charge. Moreover, Ms. Martin's failure to obtain a promotion to the group leader position in September 2003 constitutes a subsequent "adverse employment action." See Allen v. Michigan Dept. of Corrections, 165 F.3d 405, 410 (6th Cir. 1999). It is Ms. Martin's ability to satisfy the fourth element which is challenged by GE. To prove a causal connection, Ms. Martin must produce sufficient evidence from which an inference can be drawn that GE did not promote her because she filed a discrimination charge. Singfield, 389 F.3d at 564. "Although no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." Id. (*quoting* Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)).

In her brief, Ms. Martin never directly addresses the issue of a causal connection.

16

Rather, she refers generally to her capacity to be a group leader[17] and argues that GE's justification for giving the position to Mr. Mazza was pretextual.  GE does not pass so quickly over this issue, arguing that "too much time elapsed between plaintiff's EEOC charge and her not receiving the position to support a causal connection between the two events." (Docket #43, at 25).  Plaintiff, for her part, makes no attempt to rebut GE's argument and does not advance an argument that the causal connection should be inferred due to temporal proximity between the EEOC charge and her failure to get the promotion.[18]  Because plaintiff does not even argue the existence of the requisite causal connection and the record would not accommodate such an argument, if it were advanced, this Court finds that Ms. Martin failed to establish a *prima facie* case of retaliation.

Even if Ms. Martin could demonstrate the requisite causal connection, she has failed to rebut GE's legitimate, non-retaliatory motive for hiring Mr. Mazza rather than her for the 9007 group leader position.  GE asserts that it hired Mr. Mazza because he was the most qualified applicant. (Docket #43, at 27).  In asserting that GE's explanation was

---

[17] In this regard, she cites to Orloski's deposition in which he stated that Ms. Martin had the "aptitude" and "interpersonal skills" required for a group leader (Orloski Dep. at 13) and to Rachmat's deposition in which he stated that Ms. Martin would be qualified to apply for a group leader position and that, assuming that she met the company guidelines, nothing would prevent her from being "acceptable as a group leader" (Rachmat Dep. at 57 and 89).  Such testimony does not bear on the causation issue at all. In fact, such testimony has little relevance at any level as her co-employees were speaking abstractly about Ms. Martin's generic qualifications and not her qualifications for the particular position at issue.  Mr. Rachmat testified that "it would be pure speculation" for him to say what group leader position Ms. Martin would be qualified for.  (Rachmat Dep. at 57).

[18] The eleven month time period in this case does not lend itself to such an argument.  Although temporal proximity by itself may support an inference of retaliation, such instances usually involve shorter periods of time.  Nguyen, 229 F.3d at 567 (noting that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference"); Singfield, 389 F.3d at 563 (concluding that the passage of only three months between the protected activity and the adverse employment decision constituted sufficient evidence of a causal connection).

17

pretextual, Ms. Martin does not contend that GE's explanation had no basis in fact. Although she extolls her own abilities, she does not argue that she was more qualified than Mr. Mazza and does not dispute that Mr. Mazza, unlike her, had prior experience in the 9007 department as well as prior supervisory and auditing experience.  Rather, her contention is that Mr. Mazza's qualifications did not actually motivate GE's promotion decision.

Ms. Martin's primary argument that GE's proffered explanation for its promotion decision was pretextual is based on her twin assertions that GE usually makes promotion decisions based on seniority and Ms. Martin had more seniority than Mr. Mazza.[19]  With respect to relevance of seniority to promotion decisions at GE, Ms. Martin presents the deposition testimony of two GE mechanics who held disparate opinions about the manner in which job postings were filled.  Although he admitted that "he did not really know people's seniority," James Horner testified that it "seemed to [him] the person with the most seniority would get the job."  (Horner Dep. at 20).  Mr. Flowers, after admitting he did not know anything about the group leader hiring process, went on to offer his opinion that it was not based on seniority and that GE simply hires whoever it wants.  (Flowers Dep. at 37-38).  In addition to their own admissions regarding their limited knowledge about the group leader hiring process, neither Mr. Horner nor Mr. Flowers has ever been involved in

---

[19] GE's failure to list qualifications for the position in the job posting and its failure to previously use a point system in its promotion decisions does not suggest, as implied by Ms. Martin, that GE viewed the applicant's qualifications as less important than his or her seniority.  Likewise, GE's promotion of another employee – Sharon Luda – to a different group leader position four years earlier, despite her lack of experience in that department, does not lend support to Ms. Martin's pretext theory. (Moyer Aff. at ¶4) Because the record does not provide any context for Ms. Luda's promotion, including whether the other applicants held the experience Ms. Luda lacked, Ms. Luda's experience does not suggest a retaliatory motive in Ms. Martin's case.

18

GE's hiring process and neither had any information about Ms. Martin's application for the 9007 group leader position. These employees disparate speculations about the group leader hiring process do not support Ms. Martin's premise about the role that seniority plays in advancement at GE. Moreover, her basic argument that Mr. Mazza's qualifications were a pretext for its true retaliatory motive in denying the position to her, an employee with greater seniority, is further undermined by the fact that Gene Bennett, another employee with more seniority than Mr. Mazza, did not receive the group leader position either.[20]

In short, Ms. Martin's retaliation claim fails because she has not established sufficient evidence of a causal connection between the filing of her EEOC charge and her failure to receive the promotion and because she failed to come forward with sufficient evidence to demonstrate that GE's legitimate, purportedly non-retaliatory motivation for its promotion decision may have been pretextual.

## IV. CONCLUSION

Although Ms. Martin has presented evidence that suggests her overtime may have decreased, that she was not afforded training in certain areas, and that she did not receive the promotion she sought, evidence of these adverse employment actions is necessary but not sufficient to avoid summary judgment on her sex discrimination and retaliation claims. Ms. Martin has failed to satisfy her *prima facie* case on these claims because she did not

---

[20] Ms. Martin also asserts that GE "contrary to advancement guidelines . . . offered the 9007 Group Leader position to two male employees before the job was posted;" however, she points to no evidentiary support for that statement. (Docket #44, at 9).

19

provide evidence that similarly situated male employees were treated more favorably than her in terms of overtime and training or that there was a causal connection between her filing of the EEOC charge and her failure to receive the promotion.  Because of these important missing links in her evidentiary chain, GE's motion for summary judgment is granted.

IT IS SO ORDERED.

       /s/ Lesley Wells
    UNITED STATES DISTRICT JUDGE

Dated:   9 May 2005